

25 Cannon Street
London EC4M 5UB
UK
+44 20 7184 7000  Main
+44 20 7184 7001  Fax
DX 30 London
www.dechert.com

Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
United States of America
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com

**ROGER BURLINGAME**
*Partner*

Roger.Burlingame@dechert.com
+44 20 7184 7333  Direct
+44 20 7184 7001  Fax
+1 212 641 5682  Direct
+1 212 698 3599  Fax

July 3, 2024

Via ECF & email

The Honorable Sarah Netburn
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States v. William Hill*, No. 24 Cr. 00082 (RMB)

Dear Judge Netburn:

I represent William Hill in the above-captioned matter, in which he is scheduled to make his initial appearance before Your Honor on July 9 or 10, 2024, following his uncontested extradition from Portugal.  The parties have agreed that Mr. Hill should be released on bail.  I write to request his release to the home in Lisbon he shares with his wife of 33 years, which the government opposes, rather than to his sister's basement in Brooklyn, which the government supports.

Mr. Hill is 65 years old.  Originally from Brooklyn, he moved to Paris in 1981, when he was 23, and remained there for the next 40 years, building a successful career in computer programming and meeting a French woman who became his wife.  In 2023, Mr. Hill and his wife moved to Portugal, where they plan to retire.

The charges against Mr. Hill involve an app called Samourai Wallet, which helped Bitcoin users transact with one another more privately and securely.  It was first offered on Google's app store to Android mobile device customers in May 2015 and remained available until April 2024.  The government alleges that it was intended as an unlicensed money transmitting and money laundering service.

This prosecution has already generated considerable controversy, with two sitting U.S. Senators decrying it as an "unprecedented interpretation" of the applicable money transmission statutes at odds with all relevant guidance from the United States Financial Crimes Enforcement Network ("FinCEN").  That guidance has long made clear that peer-to-peer apps like Samourai Wallet, which do not exercise independent—or indeed, any—control over virtual currency stored or transmitted using the software, do not qualify as money transmitting services since the app's users, not its providers, transmit the virtual currency.  The fact that Mr. Hill—and Google—offered it openly for nine years evidences that they, like the Senators, also thought it was legal.

Courts in this district routinely release defendants on bail to their homes overseas in circumstances where requiring them to remain in the United States is not necessary to ensure



their return to Court,[1] and that is plainly the case here. Even putting aside the clear defenses available to Mr. Hill, who is presumed innocent and promptly consented to extradition after retaining U.S. counsel, he poses no flight risk. The extraordinarily robust bail package negotiated with the government would render his loved ones homeless were he not to appear for trial, and the realistic sentence this stable 65-year-old coder would likely face were he convicted of programming an app he reasonably believed to be legal would be dwarfed by the one he would receive were he to flee. Mr. Hill should be allowed to return to his home in Lisbon pending trial.

---

[1] *See, e.g.*, *United States v. Phillips*, No. 22 Cr. 00138 (S.D.N.Y.) (U.K. citizen, a hedge fund CEO charged with a $20 million commodities fraud, released on bail to the U.K. prior to jury trial and eventual guilty verdict); *United States v. Newland*, No. 20 Cr. 00351 (SHS) (S.D.N.Y. 2022) (ECF No. 81) (U.K. citizen charged with an $86 million art fraud released on bail to the U.K.); *United States v. Neilson*, No. 21 Cr. 00189 (S.D.N.Y.) (U.K. citizen charged as a co-defendant in a boiler room scheme that allegedly defrauded victims of over $6 million released on bail to the U.K.); *United States v. Robson et al*, No. 14 Cr. 00272 (S.D.N.Y.) (four of the defendants, each a U.K. citizen charged with wire fraud with market wide losses estimated to exceed $600 billion, released on bail and permitted to travel to the U.K. and certain other countries); *United States v. Black*, No. 16 Cr. 00370 (S.D.N.Y.) (U.K. resident accused of engaging in a 6-year conspiracy to manipulate LIBOR with losses to counterparties estimated to exceed $4 million who voluntarily appeared from the U.K. released on bail with travel limited to the U.S., the U.K, and New Zealand); *United States v. Hussain*, No. 16 Cr. 00462 (N.D. Cal.) (U.K. citizen charged with $16 million fraud involving manipulation of financial records released on bail to the U.K., with travel permitted except to countries without an extradition treaty); *United States v. Conti*, No. 14 Cr. 00272 (S.D.N.Y.) (U.K. citizen accused of manipulating LIBOR with losses to counterparties estimated to exceed $550,000 released on bail, with travel permitted to the U.K. and France); *U.S. v. Allen*, Co. 14 Cr. 00272 (S.D.N.Y.) (U.K. citizen accused of manipulating LIBOR with losses to counterparties estimated to exceed $1.1 million released on bail and permitted to travel to England and France); *United States v. Bachmann*, No. 11 Cr. 00095 (E.D. Va.) (Swiss citizen charged with conspiracy to defraud the U.S. as part of a $10 billion tax evasion scheme released on bail to Switzerland (from where defendant could not be extradited)); *United States v. Thompson*, No. 14 Cr. 00272 (S.D.N.Y.) (U.K. citizen accused of manipulating LIBOR released on bail and permitted to travel to England and various other countries); *United States v. Ogiermann*, No. 10 Cr. 80157 (S.D. Fla.) (Luxembourg citizen charged with antitrust violations released on bail with no travel restrictions until 30 days prior to trial); *United States v. Van de Weg*, No. 10 Cr. 80157 (S.D. Fla.) (Luxembourg citizen charged with antitrust violations released on bail with no travel restrictions until 30 days prior to trial); *United States v. Usher, et al.*, No. 17 Cr. 00019 (S.D.N.Y.) (three U.K. citizens charged with manipulation of foreign exchange trading released on bail to the U.K.); *United States v. Kyomoto*, No. 15 Cr. 00044 (E.D. Ky.) (Japanese citizen convicted of antitrust conspiracy released on bail without travel restrictions pending self-surrender for 18 month sentence); *United States v. Horie*, No. 15 Cr. 00003 (N.D. Ohio) (Japanese citizen convicted of antitrust conspiracy released bail without travel restrictions pending self-surrender for 18 month sentence); *United States v. Makov*, No. 05 Cr. 00888 (S.D.N.Y.) (Dual Israeli-American citizen charged with tax shelter scheme with approximately $83 million in losses released on bail to Israel).



<u>Argument</u>

    A.  Legal Standard

The Bail Reform Act "requires a court to order the pretrial release of a defendant on a personal recognizance bond 'unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'" *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citing 18 U.S.C. § 3142(b)). Once that determination is made, the law "favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required.'" *Id.* (citing 18 U.S.C. § 3142(c)(1)(B). "[T]o determine whether the Government's [proposed conditions of pre-trial release are] excessive," the Court "must compare [them] against the interest the Government seeks to protect by means of [such conditions]." *U.S. v. Salerno*, 481 U.S. 739, 755 (1987).

    B.  Analysis

The government does not argue that Mr. Hill's release poses a danger to the community. The only issue is risk of flight, and as to that, the parties agree that Mr. Hill should be released on bail. The sole issue for Your Honor under the Bail Reform Act is thus whether Mr. Hill's release to Portugal or Brooklyn represents "the *least* restrictive condition, or combination of conditions . . . [that] will reasonably assure [his] appearance as required." 18 U.S.C. § 3142(c)(1)(B) (emphasis added).

Because Mr. Hill does not present a flight risk, and the proposed bail package and conditions provide far more than the least restrictive combination of conditions that will reasonably assure his appearance, Mr. Hill should be released to his home in Lisbon.

    C.  Lack of Flight Risk

Mr. Hill is a 65-year-old U.S. citizen. After growing up in Brooklyn, in 1981, at age 23, he moved to Paris to learn French. He spent the next few years teaching himself computer programming while working various jobs, including several years tending bar at the U.S. Embassy. In 1986, the British Embassy hired him in IT support. It turned out to be the first step in a 38-year career in tech, the vast majority of which he spent writing computer code. In or about 2000, Mr. Hill focused his coding on the emerging mobile applications space—the work he has performed over the last two and a half decades.

Soon after its 2008 creation, Mr. Hill became fascinated with Bitcoin. By 2013, he had joined Blockchain.com—a company that went on to become a foundational cryptocurrency services provider—to write code for its Bitcoin mobile applications. He left in 2016 but has performed the same work in the time since.[2]

Mr. Hill ended up living in Paris for 42 years. In 2023, he and his wife of 33 years, a retired French high school English teacher, moved to Lisbon. They bought an apartment and planned

---

[2] In addition to his work coding, Mr. Hill published *September 11 Wall Street Sonnets and Other New York City Poems*, a collection of poems reflecting on the months following the World Trade Center attack. His wife translated the collection into French.



Hon. Judge Netburn
July 3, 2024
Page 4

to live out their days there alongside Ms. Hill's sister and her husband, who were soon to retire and follow, with both couples benefiting from the much cheaper cost of living.

Prior to this case, Mr. Hill had no involvement with law enforcement whatsoever. He has been a law-abiding member of society for the entirety of his 65 years, gainfully employed throughout his adult life, and has enjoyed a happy and stable marriage of more than 33 years.

The charges here do not allege he engaged in secret activity—they did not expose hidden facts that clash with this portrait of a stable, mature, dependable man. Rather, the government alleges that conduct he engaged in openly and notoriously—wholly consistent with the reasonable belief of its legality shared by law firm partners and U.S. Senators—was a crime.

And when Mr. Hill learned of the government's investigation, he stayed put. He first became aware of this investigation while at home in Lisbon in March 2024, when the operator of his company's computer servers informed him that service had temporarily shut down in order to provide the U.S. Department of Justice ("DOJ") with copies of the servers. The next month, on April 24, 2024, Portuguese authorities acting at DOJ's request arrested Mr. Hill in his same Lisbon home. *Cf. United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (defendant not a flight risk where "[he] apparently took no steps to leave the jurisdiction after federal agents executed a search warrant at his home"). The local prosecutors opposed bail, and Mr. Hill has remained incarcerated in Lisbon in the time since.

Through his local Portuguese counsel, Mr. Hill retained Dechert as his U.S. counsel, and shortly thereafter—before his arraignment in the extradition case—he waived his right to contest extradition. A Portuguese judge ordered it on June 18th, and as Your Honor is aware, he is scheduled to be extradited on July 9th.

Mr. Hill's long, stable life history and mature profile, including his response to this case—not fleeing upon learning of the servers' seizure; opting to fly across the ocean to face the charges—do not present a risk of flight.

    D.   The Charges

The government alleges that in or about and between 2015 and 2024, through their operation of Samourai Wallet, a Bitcoin wallet[3] app offering privacy and security features, Mr. Hill and his co-defendant conspired to (i) operate an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1960(b)(1)(B) and (b)(1)(C), and (ii) launder money in violation of 18 U.S.C. § 1956(h). Specifically, the government alleges that the defendants "intended and well-knew" that Samourai Wallet was a haven for criminals to engage in large-scale money laundering and sanctions evasion, and that approximately 5% of the Bitcoin it alleges flowed through Samourai Wallet—"over $100 million" of "over $2 billion"—constituted criminal proceeds. ECF No. 1 ¶ 1.

Samourai Wallet's website described the app as a "modern bitcoin wallet" designed "with the most advanced privacy enhancing technologies on the market." The features it touted, such as Ricochet and Whirlpool, allowed users to transact more securely and privately by reducing a

---

[3] A cryptocurrency wallet is a device, program, or online service that allows users to generate cryptographic keys to store and manage their digital assets.



Hon. Judge Netburn
July 3, 2024
Page 5

recipient's—and unrelated third parties'—ability to piece together (i) the transferred Bitcoin's transaction history[4] and (ii) the sender's wallet address information—information that can reveal the sender's entire transaction history and be used to calculate the remaining Bitcoin in the sender's wallet.

Google first offered Samourai Wallet, an Android-only app, to Android mobile device users in its app store in May 2015. It remained available through April 2024, when Google removed it following Mr. Hill and his co-defendant's arrest. Throughout those nine years, Samourai Wallet operated openly and notoriously, and Google made it available to the world's approximately 3.9 billion Android users.

The government does not allege that the defendants were aware of or agreed to any specific criminal transaction with any particular criminal, but rather that their agreement to commit the crimes charged is demonstrated by their (i) creating a "privacy" service offering features "intended to assist individuals engaged in criminal conduct to conceal the source of the proceeds of their criminal activities," (ECF No. 1 ¶ 10), and (ii) "encourag[ing] and openly invit[ing] users to launder money through Samourai," (*id.* at ¶ 16).

E. Relevant Legal Background

Federal statute prohibits the operation of unlicensed money transmitting businesses. 18 U.S.C. § 1960 ("Section 1960"). Section 1960 defines "money transmitting" as "transferring funds on behalf of the public." *Id.* § 1960(b)(2). The Bank Secrecy Act ("BSA") similarly defines a "money transmitting business" as any business that engages in the "transmission of currency, funds, or value that substitutes for currency" or that facilitates "the transfer of money." 31 U.S.C. § 5330(d)(1).

FinCEN's regulations closely follow the statutes, defining "money transmission services" as either: (i) "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means"; or (ii) "[a]ny other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i). Services that merely "[p]rovide[] the delivery, communication, or network access services used by a money transmitter to support money transmission services," are specifically exempt. *Id.* § 1010.100(ff)(5)(ii)(A).

During the period Samourai Wallet was available to users on Google's app store, FinCEN published and repeatedly reaffirmed guidance establishing that non-custodial cryptocurrency wallets like Samourai did not qualify as money transmitting services under 31 C.F.R. § 1010.100(ff)(5). For example, in January 2014—before Samourai Wallet was launched—FinCEN published guidance stating that activities "involv[ing] neither 'acceptance' nor 'transmission' of the convertible virtual currency . . . are not the transmission of funds within

---

[4] Bitcoin uses blockchain technology to record and maintain a clear transaction history for each Bitcoin. The blockchain is, effectively, an immutable public ledger of all the transactions for each token. The blockchain records: (i) the addresses of the sender and receiver; (ii) the timestamp of the transaction; (iii) references to all previous transactions involving that Bitcoin; and (iv) confirmation of the given transaction.



Hon. Judge Netburn
July 3, 2024
Page 6

the meaning of the Rule."[5]  FinCEN Administrative Ruling FIN2014-R001, *Application of FinCEN Regulations to Virtual Currency Mining Operations* (Jan. 30, 2014), at *3.  This guidance made clear that direct receipt and control of assets are required elements of money transmission.  *Id.*

In May 2019, FinCEN published additional guidance consolidating the administrative rulings and guidance it had issued since 2011.  It again confirmed that cryptocurrency wallet providers must have "total independent control" over the cryptocurrency being transmitted from a wallet to qualify as a money transmitter under the BSA.  *See* FinCen Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* (May 9, 2019) § 4.2.  It also underlined that "[a]n anonymizing software provider is not a money transmitter," (*Id.* § 4.5.1(b) (emphasis added)).

Based on this consistent guidance, cryptocurrency wallet providers understood that non-custodial wallets—*i.e.*, software like Samourai Wallet where the wallet provider does not have any control over the stored cryptocurrency[6]—did not qualify as money transmission services under the BSA.  *See*, *e.g.*, Nikhilesh De, *FinCEN Says Some Dapps Are Subject to US Money Transmitter Rules*, COINDESK, May 9, 2019, https://tinyurl.com/9r2nw6cb (explaining that under FinCEN's May 2019 guidance "[n]on-hosted wallets . . . meaning those where users control their funds, are exempted from possible money transmitter classifications"). Accordingly, it has been understood that non-custodial wallets do not need to be registered under Section 1960 or the BSA, and that the anti-money laundering provisions under the BSA do not apply.  *See*, *e.g.*, King & Spalding LLP, *Tying It All Together: FinCEN Consolidates Several Years of Cryptocurrency Guidance*, May 21, 2019 https://www.kslaw.com/attachments/000/006/966/original/ca052119.pdf ("[P]roviders and users of 'unhosted' wallets — software on a person's device enabling them to conduct transactions in [convertible virtual currency] — are not money transmitters so long as the wallets are used to purchase goods or services on the user's own behalf.")[7]; Morgan Lewis LLP, *FinCEN Issues Guidance on Crypto*, May 21, 2019, https://www.morganlewis.com/blogs/finreg/2019/05/fincen-issues-guidance-on-cryptos

---

[5] FinCEN uses "Rule" here in reference to its amended definitions and regulations relating to Money Services Businesses.  *See* Bank Secrecy Act Regulations – Definitions and Other Regulations Relating to Money Services Businesses, 76 FR 43585 (July 21, 2011).

[6] As described in the Indictment, users can "store their private keys for any [Bitcoin] address they control inside of the Samourai program."  ECF No. 1 ¶ 9.  During this process, the users' "private keys are not shared with Samourai employees."  *Id.*  Since a private key is necessary to "authorize a transfer of Bitcoins," (*id.* ¶ 9), Samourai Wallet did not have custodial control – *i.e.* the required "total independent control" over the Bitcoins stored on its users' wallets, (s*ee* FinCen Guidance, FIN-2019-G001, § 4.2).

[7] Convertible virtual currency refers to a "medium of exchange that can operate like currency" but does not have legal tender status, and "that either has an equivalent value as a currency[] or acts as a substitute for currency."  FinCen Guidance, FIN-2019-G001, § 1.3.  Convertible virtual currency includes, but is not limited to, digital currency, cryptocurrency, cryptoassets, and digital assets.  *Id.*



Hon. Judge Netburn
July 3, 2024
Page 7

("conducting a transaction through the non-hosted wallet . . . to purchase goods or services on the user's own behalf . . . is not a money transmi[ssion] and is not subject to the BSA.").

Loudly echoing these interpretations, United States Senators Cynthia Lummis (R) and Ronald Wyden (D) decried this prosecution as an "unprecedented interpretation of" the applicable statutes, stating that the unlicensed money transmitting business charge "contradicts the clear intent of Congress and the authoritative guidance of [FinCEN]." Senators' Lummis & Wyden's May 9, 2024 letter to U.S. Attorney General Merrick Garland, attached hereto as Ex. A at 1. The Senators explain that "[t]he statutes and regulations are clear that direct receipt and control of assets are required elements of money transmission." *Id.* at 1. As a result, non-custodial crypto wallet developers or publishers like Samourai Wallet "<u>are not subject to money transmitting business registration.</u>" *Id.* at 2 (emphasis in the original).

F. The Charges in Context

The government alleges that Mr. Hill's operation of a business he had every reason to believe did not qualify as a money transmitting business constituted a crime because (i) contrary to FinCEN guidance and the overwhelming consensus of belief at the time, it actually <u>was</u> a money transmitting business and was unlicensed, and (ii) as a money transmitting business that did not put in place the controls required by the BSA to prevent money laundering, when criminals used the app to launder money, its makers agreed to launder money.

The theory is as aggressive as it is expansive, akin to charging Apple for cybercrimes committed with MacBooks. And like such a charge, it impermissibly uses criminal law to affect policy change. To stop Bitcoin wallet providers from providing privacy and security services, or to force them to police their customers as banks must, the government has not sought to change the law, or even FinCEN's guidance on it. It has prosecuted individuals operating a service they had every reason to believe was legal, and stretched to decorate the charges with decontextualized quotes that attempt to sketch out their agreement to criminal transactions the government does not allege they knew about in advance or explicitly agreed to.[8]

---

[8] This letter is not the proper forum to dissect each of the eight statements the government attributes to Mr. Hill and his co-defendant to support the claim they agreed to launder money. It is, however, worth noting (i) their scant number—one per year of the conspiracy overall; one every three years for Mr. Hill—and (ii) their openness to varying interpretations. For example, the three statements the government claims Mr. Hill actually made—*i.e.*, not unsourced marketing materials—involve (i) his *disagreement* with a statement extolling Bitcoin's use for allegedly illegal "Silk Road" transactions like those cited in the indictment as evidence of money laundering, (ECF No. 1 ¶ 17), (ii) his *rejection* of a claim that Samourai Wallet was engaged in illegal activity by expressing his deep lack of concern about the allegation (put otherwise, an expression of his deep confidence that the app was legal), (*id.* at ¶ 18), and (iii) his recitation of facts about Samourai Wallet's operations that flowed from it not being subject to the BSA, (*id.* at ¶ 25). These are, of course, not the only possible reading of each statement—the government will argue at trial in favor of the interpretation set forth in the indictment. The point is not to try the case in this bail letter, but to note that in a speaking indictment showcasing its best evidence for the criminal intent necessary to convict, in a case



Hon. Judge Netburn
July 3, 2024
Page 8

Mr. Hill's understanding of Samourai Wallet's legality squared with that of U.S. Senators, lawyers who focus on the crypto industry such as the authors of the King & Spalding and Morgan Lewis articles cited above, the rest of the Bitcoin community, and, apparently Google, which by publicly offering and profiting from the sale of an app the government now claims was unambiguously "intended to assist individuals engaged in criminal conduct to conceal the source of the proceeds of their criminal activities," would be, according to the government's theory, an unindicted co-conspirator.

Sitting U.S. Senators showing rare bipartisan agreement to take issue with *criminal charges* is a far from an everyday occurrence. Their opposition is rooted in the radical interpretation placed on well-understood statutes to prosecute conduct long understood to be legal. It is a fact that speaks volumes about the government's odds of success at trial, the likely sentence were there a conviction, and the chances of the appeal that would follow.

It is important to highlight that the money laundering charges are not separate and distinct from the unlicensed money transmitter charges of which the Senators complain, but rather their flip side. If Samourai Wallet was not a money transmitting business, it had no obligations to prevent money laundering under the BSA. The money laundering charges are a direct outgrowth of the unlicensed money transmitting business charge, and inevitably follow, as they will in any future prosecution under this expansive theory. And as stated, the charge is not that Mr. Hill knew of any specific money laundering transaction—let alone that he agreed to engage in one—but rather that a handful of decontextualized statements show (i) he knew or must have known that such transactions were happening and (ii) he therefore agreed to them. In other words, the allegation is that because he ran an unlicensed money transmitting business and was, or should have been, aware that criminals used the business to launder money, he conspired to money laundering.

The novelty and aggressiveness of the charges goes directly to risk of flight. Mr. Hill is not facing an assured life behind bars. He is facing charges he can, should, and will contest at trial. When he does, and his conduct is properly contextualized—showing him to be a computer programmer and privacy advocate operating what he believed to be a legal business addressing one of Bitcoin's flaws—it will render him sympathetic, likely not guilty, and if the jury were to get it wrong, unworthy of a lengthy sentence. Indeed, given his actual conduct when placed in context, Mr. Hill could only risk the sort of sentence that might cause one to consider flight by fleeing from the charges.

G. The Suretors, Bail Package & Conditions of Release

As noted, with the exception of the location where he will reside during the pendency of the case, the parties have agreed to Mr. Hill's release on bail.

The government has agreed to Mr. Hill's release to his sister's basement in her home in Brooklyn on a $2 million bond supported by three suretors: his wife; his sister, a nurse who is his lone sibling; and his brother-in-law, a retired firefighter who lives with Mr. Hill's sister and two of their adult children in their Brooklyn home. As security, Mr. Hill's wife will pledge $200,000 in cash; his sister and her husband, their Brooklyn home valued at approximately

---

that will turn on intent, the government has included a scant number of statements that are far from smoking guns.



$1.65 million. The agreed conditions of Mr. Hill's release include (i) location monitoring via an ankle bracelet, (ii) travel limited to the Eastern and Southern Districts of New York, (iii) a 7 p.m. curfew, and (iv) other standard conditions that Pretrial Services recommends.

The government does not agree to Mr. Hill's release to Portugal. However, if the Court were to find that he is properly released there under the Bail Reform Act, the parties have agreed to the face value and security for such a bond: $3 million supported by the same cash and property pledged in support of the bond noted above, as well as (i) Mr. Hill and his wife's home in Portugal, which is valued at approximately €1,050,000 (~$1,120,000), and (ii) Mr. Hill's wife's sister and her husband's home in Paris, valued at approximately €272,700 (~$295,000).[9]

The conditions attending Mr. Hill's release to Portugal have not been discussed. We propose mirroring the agreed-upon conditions that he would be under were he in Brooklyn together with terms to effectuate them that have been used in other cases where defendants are released on bail to their homes overseas. These would include: (i) my possession of Mr. Hill's passport, and my or a member of my firm traveling with Mr. Hill as required to attend court appearances, maintaining possession of the passport throughout; (ii) travel limited to Lisbon city limits, with a condition that Mr. Hill possess his phone at all times with location tracking enabled—a condition that can be monitored with randomly-timed video calls by his Pretrial Services Officer ("PTSO"); (iii) the same 7 p.m. curfew, which can also be enforced through random calls from his PTSO; and (iv) any other conditions that Pretrial Services recommends.

Mr. Hill has no children. His family consists of his wife, his sister and her husband, and his wife's sister and her husband. All are sureties to the bond. None are wealthy, and all have bet their financial futures on his abiding by the terms of the bond. These sureties—a nurse, a retired firefighter, a physical trainer, an administrator for a gym, and a retired teacher—have drawn on a combined 172 years[10] witnessing Mr. Hill's behavior to inform their decision that he will return to court as required. Further, as a group ranging from their late-fifties to mid-sixties, with each either already retired or soon-to-be retired, they are making this decision with the knowledge that they could never hope to recoup what they would lose were he to flee. These sureties ideally fulfill both halves of the logic driving our surety-driven bail system:

---

[9] As detailed in their letters to the Court attached hereto at Exhibits B & C (the "Letters"), French and Portuguese counsel stand ready to immediately execute the attached mortgages on the pledged foreign properties that will (i) prevent their transfer during the life of the bond and (ii) create a $3 million interest in each in favor of the SDNY Clerk of Court that would perfect upon a finding that Mr. Hill violated the conditions of his release. In fact, counsel have already taken steps to execute these mortgages, including registering the proposed promissory note for Mr. Hill's home with the Portuguese land registry. The Letters and their supporting attachments (and translations) detail the work performed to value the properties and how the legally binding obligations in each country will prevent transfer and secure the U.S.'s interest in the properties such that the sureties' interests would be defaulted and the U.S.'s secured upon the violation of Mr. Hill's terms of release. Should the Court agree to Mr. Hill's release, the effectuating contracts will be fully executed and become effective within five working days.

[10] Mr. Hill's 62-year-old sister has known him her whole life; her husband of 39 years, for the duration of their marriage; his wife, for 34 years, 33 of which they have been married; her sister, for the duration of their marriage; and her husband, for the 10 years of their marriage.



their deep knowledge of Mr. Hill and willingness to bet all they have on him sheds significant light on who he is and the actual risk of flight he presents; the assuredness of their financial destruction were there a violation and Mr. Hill's knowledge of that fact provides significant additional assurance that their bet is a safe one.[11] It is an extraordinary bail package and should be a significant factor in the Court's weighing of the combination of conditions that "reasonably assure [Mr. Hill's] appearance."

Turning to the conditions of release, it is worth underlining that the "reasonably assured" standard does not require conditions that make flight impossible. The government has acknowledged this—as well as a significant lack of flight risk—by agreeing to Mr. Hill's release to Brooklyn on an ankle bracelet. In evaluating the differing conditions of release, the question presented is narrow: whether Mr. Hill living in his home in Portugal rather than Brooklyn, and monitoring his location via a phone rather than an ankle bracelet, will make the difference between his reasonably assured appearance and flight.

The answer is clear. The government trusts Mr. Hill will not flee from Brooklyn because of who he is, his demonstrated desire to face and not run from the charges, the realistic sentence he would face on them, and the reassurance provided by a bail package that would financially cripple and leave homeless the people he loves. These factors hold equally true in Portugal—indeed, more so, due to the significantly more robust bail package—and are unaffected by the differential between monitoring via phone or ankle bracelet. Were Mr. Hill intent on fleeing from the case without his passport, nothing about the ankle bracelet or his location in Brooklyn would change the equation. Both passport-less flights to a life on the run would be equally hard for this 65-year-old computer programmer who must apply prescription glaucoma eye drops daily. Both would require him to either abandon his wife of 33 years or force her into a life on the run alongside him. Both would inevitably end in capture and set him up for an exponentially longer bail-jumping sentence than he would likely receive on the underlying charges. And both are utterly fanciful and not remotely in line with who he is, who the sureties know him to be, and the actual risks this prosecution creates.

Mr. Hill's return to court as required is more than reasonably assured under either set of bail conditions. The debatable added flight deterrence provided by the ankle bracelet and Brooklyn location are immaterial to the equation—let alone forming the tipping point they must to affect the Court's determination—and any added deterrence they may provide is more than overcome by the additional suretors and properties that would support his release to his home.

---

[11] The Court can trust that the negative consequences for the three overseas suretors are assured. Upon an order that the bond were violated, the U.S.'s interest in the overseas properties would be just as assured as its interest in the $200,000 cash deposited with the Clerk of Court. The government might need to take steps to sell the property just as it would for the U.S. property, and those procedures might not be familiar, but that is irrelevant to the bet placed by the suretors: upon a violation the U.S. would have a perfected right to force sale of their properties, that would appear in the public record, and the properties would be unsellable.



Hon. Judge Netburn<br>
July 3, 2024<br>
Page 11

Finally, because Mr. Hill will contest the charges at trial and, if necessary, beyond, he is likely to spend significant time—potentially years—on bail.[12]  In Brooklyn, that time would be a serious and unwarranted punishment for a man presumed innocent.  It would not only entail living thousands of miles from his home in a basement, but doing so in a country where neither he nor his 65-year-old wife enjoy the free medical care they do in Portugal, something that could render this unwarranted and unnecessary punishment financially devastating were either of them to face a serious health issues.

Conclusion

For the reasons above, we respectfully request Mr. Hill's release to his home in Lisbon on the bail package and bond conditions outlined above.  We greatly appreciate the Court's careful consideration and look forward to addressing any questions Your Honor may have.

Respectfully submitted,

Roger A. Burlingame

cc:    The Honorable Richard M. Berman (via ECF)
       AUSAs Andrew Felton & David Chan (via ECF & email)

---

[12] The government has already indicated that discovery in this case will be extremely voluminous; reviewing it will be time consuming.  When combined with anticipated substantial motion practice, the trial could well not take place until deep into 2025.